21-3039 United States of America v. Ivan Lamont Robinson, a balance. Mr. Mestiz, for the balance. Mr. McGovern, for the affiliate. Good morning, Counsel. Good morning, Your Honor. With the Court's indulgence. Yes. Good morning, and may it please the Court. Michael Mestiz of Williams and Connolly for Appellant Ivan Robinson. I'd like to reserve two minutes of my time for rebuttal, and I'll keep my eye on the clock. I'd like to focus my time today on the Brady violation. The government admitted below that, quote, the crux of this case, and quote, the only element in dispute was whether Dr. Robinson was prescribing medications in good faith. An essential part of the government's theory was that when Dr. Robinson threatened to report pill-seeking patients, he was, quote, just putting on speeches, but didn't turn any of them away. But the government fails to produce information from its own files showing that Dr. Robinson was telling the truth. This evidence was directly inconsistent with the government's theory of the case, and its suppression was material. Dr. Robinson, in fact, knew that this information would be essential to his defense, and so he repeatedly requested from the government records of his reporting pill-seekers to authorities. In response to his requests, the government repeatedly told him that no prior reports existed, reversing course only after trial. And it failed to disclose a detailed CCN report of an incident in which Dr. Robinson detected a pill-seeker, reported her to authorities, and took the prescription back in the police's presence. Now, the district court correctly recognized that these reports were favorable to Dr. Robinson, but the court erred in concluding that they were not material. Suppressed reports would have been powerful evidence that Dr. Robinson engaged in good-faith treatment of his patients, that he was not, as the government suggested, knowledgeable that his patients were pill-seekers, but somehow complicit in prescribing the medication. The district court's take on materiality, and this is perhaps going to be a quibble rather than an analysis, is that the case was so overwhelming that this could not have made any difference. Now, while that might perhaps be styled as a harmless error decision rather than as a materiality of withholding decision, why isn't that correct? This was a pretty overwhelming case, wasn't it? Well, Your Honor, my first response there would be that this court and the Supreme Court have been very clear that the Brady materiality analysis is not a sufficiency of the evidence. So the question is whether, in any reasonable likelihood, it could have affected the judgment of a jury. The defendant, and this is weary, need not show that he's more likely than not to have been acquitted. I think Johnson, quoting Kiles, this court's opinion, says, would the evidence have resulted in a markedly weaker case for the prosecution or a markedly stronger one for the defense? And that's the case here, Your Honor, to get directly to the record. You know, the government was able to tell the jury below, Dr. Robinson knew these patients were pill-seekers. He never reported them. And, in fact, the suppressed evidence would have been powerful extrinsic evidence, corroborating evidence that he did. And so in Ray Seald's case, this court found that corroborating evidence when the government calls into account testimony is material. Long B. Hooks, the recent Fourth Circuit case, I think is also highly on point here. Now, I will say, with respect to the rest of the evidence in the record, you know, there is evidence from patients that, for example, they felt they had to lie to Dr. Robinson in order to get their prescriptions. And his prescriptions, was it routine that he gave a 30-milligram prescription for it? Your Honor, that was part of his patented protocol. And, in fact— The answer would be yes, then, right? The answer— Is it routine that he gave a 30-milligram— The answer would be yes. —natty pills in a prescription? Your Honor, I believe that that is correct, although I'm less certain about— And the prescriptions were so large in quantity and time that the pharmacists were alarmed enough that they alerted authorities? Is that not also evidence? Certain pharmacists testified to that, although they did not tie that to any convictions. And he insisted on being paid with money orders, blank money orders. Why was that, counsel? Your Honor, that's not unusual, and witnesses testified it's not unusual. These are people who don't have insurance or whose insurance does not cover this. And so, you know, I think the government has kind of pursued a guilt by gestalt theory here, the idea that, well, they're not familiar with what this practice looks like. In fact, I think the factual record, as laid out in our briefs, are quite complex, such that, in particular, this suppressed evidence could very reasonably have swayed a juror in considering the critical issue here, which is mens rea. And I think Ruan underscores that. You know, this Court and the Supreme Court have been particularly attentive in questions where intent separates innocent from wrongful conduct. The question of intent is incredibly important, and the government conceded that below. So here, the suppressed reports would have shown that when Dr. Robinson was aware of pill seekers, he reported them. That leads to a very strong inference that he was not aware that the patients charged in the indictment were merely seeking pills. And, indeed, each of them had actual injuries. Each of them, at Dr. Robinson's request, brought in MRIs. And, you know, there's testimony that he followed up with them to ensure that they were following the treatment protocol. There is some gestalt to the government's case, but there's also a fair amount of proof of individual instances, right? There are 40-something counts, which are supported by testimony from the undercover agents and the pill seeker patients about what happened in their individual cases with minimal consultation and the like. And, Your Honor, I don't think that the Court should be concerned about that. I have two primary responses. You know, the first response is that the government goes out of its way to say, well, patients' views about whether or not they were adequately treated is irrelevant. You know, we don't need to consider that. All the evidence in the record shows that the straight-leg test, which is the standard diagnostic test, doesn't take very long. The other thing is that the government pursued, really, a wholesale theory, right? Their wholesale theory was this entire thing is a sham. And so I think the government's central issue— I guess it seems to me they pursued both. Okay. Wholesale and retail. Well, and I think then their theory as to mens rea, for example, is that all of this was a sham, right? They didn't claim that, well, he knew certain people were pill seekers. He didn't know other people were pill seekers. That's kind of the suggestion on appeal that they make as to why, you know, some of these reports might not have been material. Assuming the government's theory, why does the government's theory have to be that all of them were shams in order for it still to be a sham there that is a violation? Well, Your Honor— You're repackaging the theory, and it's not necessary that he could also have legitimate patients and still be violating the statute in the instances that were pill seekers. And, Your Honor, the government certainly could have argued that to the jury, taking this Brady material into account. The problem is that argument is substantially more complicated than the theory they were permitted to advance to the jury. I don't see the complication. Well, so think about— You can't deny that there have been medical professionals around the country who were medical professionals with legitimate patients who were nonetheless convicted of— I don't deny that, Your Honor, but that's not— That's not very complicated, counsel. Well, the government here came in, and they said, look, he knew all of these people were pill seekers. This was a classic pill mill. There was no treatment here. He never reported any of these people. They suppressed evidence showing that he, in fact, did report pill seekers when he was aware of them. And so the government could have argued— But there was some evidence to that effect that was not suppressed, right? There was the DEA report, which is incredibly bare bones. And you can think of the DEA report as focusing on the pill seeker. The CCN report, which is suppressed, focuses on what Dr. Robinson did to detect. And that was not disclosed. That's at 189. There's a little paragraph that, contrary to what the government said, Dr. Robinson checked the referral. He detected a pill seeker. And then he actually took his prescription back in the presence of police. And I see I'm running into my rebuttal time. I just want to squarely answer Your Honor's question, which is that the government was able to come in and say he never reported anyone. Now, in fact, had this evidence been in the record, the government would have had to come in and say to the jury, well, okay, he reported some people. But he did so only as part of this scheme and to throw people off the scent. And he knew other people were pill seekers, but he didn't report them. And that is a substantially harder inference for the government to prove beyond a reasonable doubt. And that's why the Brady evidence is material. It seems to me like both sides here were trying to have their cake and eat it, too, because the government was just prosecuting the particular prescriptions at issue, not arguing or trying to prove to the jury that the entire practice was corrupt. And the evidence that you're arguing is material didn't bear on the prescriptions or patients at issue in the indictment. It dealt with other ones. And so it seems to me at this point the defense wants to have the broader view. But at many other times during the trial, the defense was arguing to limit the evidence to these prescriptions and these patients that are charged. And so the government at times did certainly seem to be trying to have a broader inference, that both were trying to go large and small. But given that the indictment involves specific individuals and specific prescriptions, and this Brady evidence, and at least as I read the government statement to which you refer, when he said never reported any of these persons, it meant the people in the indictment, which is accurate. They were never reported, as I understand, as pill reporters. And so help me understand one more time how, then, it's material that he reported other persons. I mean, I get your argument about why the DEA report and the CCN report is so much more valuable. Sorry, the CCN report is so much more valuable, but it wasn't speaking to the people at issue in the indictment. And that's what the government statement was about, and that's what the case was about. Your Honor, if I may briefly respond, the fact that he reported other pill seekers when he detected them strongly suggests that he did not know these individuals were pill seekers. And that weakens the corresponding inference from the government that he was knowingly and intentionally prescribing these medications outside the course of ordinary medical practice. So it's true that the individuals in the indictment he did not report. But the fact that he reported other pill seekers when he was aware of them gives strong evidence that these pill seekers successfully deceived him. Were these other pill seekers, for example, in the CCN report, reported in the same timeframe as when the indictment is covering those patients who were being treated, or was it a different timeframe? Yes, Your Honor. So there are two sets of suppressed reports here. The prior reports were from 2011. The CCN and DEA reports, I believe, were from 2013. And, in fact, that entire period is at issue. The district court erred below in saying that 2011 was somehow removed from time, and I don't really see the government defending that conclusion. But the CCN report, one that has language you most like about Dr. Robinson's practice, that one was during the same timeframe as charged in this case? Yes, Your Honor. So while he was treating these individuals, he was reporting pill seekers simultaneously? Yes. Yes, Your Honor. And, indeed, in 2011, he was also treating one of the patients charged in the indictment. So that 2011 period is relevant as well. I see I have run through my time. We'll give you some time for rebuttal. I appreciate that, Your Honor. Any more questions? Just one more, which is when we assess materiality, we have to look counterfactually at what would have happened had the material been disclosed. And part of that is you get to put in the prior reports and make the arguments to the jury that you've made here. Part of that is also that Agent Pryor would have testified that she thought this reporting was a sham. Doesn't that tend to mitigate the impact of what you could have done had this been disclosed? Your Honor, that's certainly what the government offers what happened. Terrific question for the jury. Quintessential question for the jury. Not something that this court should evaluate on appeal, but if the government wants to go in and argue, well, he knew some people were pill seekers. He didn't report them. He knew other people were pill seekers, and he did report them. All of this is part of kind of an increasingly elaborate scheme. They can argue that to the jury, and the jury can weigh that in the first instance. But I think that's not a reason to find this evidence material as a matter of law. Thank you. All right, thank you. Good morning. May it please the Court, Michael McGovern on behalf of the Appellee of the United States. Over the course of nearly a month, a jury was presented with evidence from the government and from Nurse Robinson regarding his treatment of 10 individuals, prescribing them on 43 occasions oxycodone. Evidence that included testimonial eyewitness accounts that Dr. Robinson had reported a pill seeker and called the police on those pill seekers. Testimonial evidence that included testimony by his office manager that Dr. Robinson kept a file of bad actors and was attempting to track individuals who were pill seekers. At the conclusion of all of the voluminous evidence, the jury deliberated, considered the arguments of both of the parties, and determined beyond a reasonable doubt that on 42 of the 43 occasions, Nurse Practitioner Robinson prescribed oxycodone intentionally and knowingly in violation without a legitimate medical purpose and outside, of course, the usual practice of business. The evidence of reporting the pill seekers that came in was from his side of that transaction, and you all attacked that as coming from self-interested and biased witnesses. Well, Your Honor, I'd like to correct that a little bit. Yes, both of the statements of pill seeking that were introduced were by witnesses that Dr. Robinson presented. One of those credibility you questioned, right? We questioned the credibility of his office manager given his incredibly close, but in closing arguments, the credibility of Dr. Erica Brock, who was an individual who testified, she was present when there were reports with authorities, and authorities arrived at the office in response to those reports. Her credibility in closing argument was never contested by the government. Does that matter? I mean, the government argues in flora after flora that official records, official statements, official communications by the government have particular force. And so whether it was a witness that you had a lot to impugn or not, it was his witness. And the value of this report or the reports, all the reports at issue here, particularly the CCN report, was that it was the government recording and describing what he did. Well, Your Honor, that was a strategic trial decision that was made by defense counsel, but they're now second guessing. Wait, wait, wait. I'm sorry. I think I wasn't clear. What strategic trial? This is suppressed information. The defense counsel had access to government reports of a pill seeker being arrested. It had a DEA report. It said the CCN report details exactly what he did. Just to step back for a second, are you trying to have this court hold that the government doesn't have to turn over its own documentation in this situation? No, Your Honor. The government hasn't contended either that the CCN or the prior reports were not favorable and were not disclosed late. Why were they not disclosed? How did that happen? There's no explanation on the record as to why the particular CCN report was not disclosed. We will note that the information in the CCN report and the incident to which the CCN report related was disclosed in the DEA 6, which is a much more extensive document. That's not answering the question as to how it could happen if you didn't turn these over. The presiding judge just asked you. You're not arguing that you didn't need to turn those over. Going back to Stephen's case and before, we have told the government repeatedly that don't you be making materiality decisions. If it's evidence that's relevant, turn it over. Why was that not done in this case? Your Honor, it wasn't done in this case because the government, the prosecutors that were providing the discovery, weren't aware of the reports. They did reach out to Agent Pryor and when they first spoke to Agent Pryor, her response was that she didn't believe that she had any reports from the incident that was discussed. It wasn't until later when Agent Pryor recalled that there was another individual present at the briefings that they contacted that agent and he was able to locate the reports. The reports were filed... Sorry. When agents make reports, that's like one of the biggest things they do. And so when there was said this known contact, this known communication and interchange, and a DEA agent says, I don't think there was a report, the prosecutor goes, okay, there's no records? You don't say go search the records? Who else was at the meeting? It just seems to me confounding that you have the two prior reports and the CCN report, which you want to blame them for not having found. And yet the government didn't do any due diligence, it seems. I'm happy to hear you tell me otherwise, but how it did... I think I'm asking the same question as Judge Santana. How on earth does this happen? And then it's found, surprise, right after trial, when one normally isn't doing discovery. So, Your Honor, to answer your question, there is an extensive discussion of what efforts the government undertook to locate these reports in the record, and that appears at A199. It is the filing that the government submitted when it provided the prior reports. And it details the numerous discussions that were had and the numerous efforts, including the search of DEA files, that were undertaken and how it was... Okay, I thought you told Judge Santel it wasn't in the record what happened. So now you're telling me there's a long record explanation of why they weren't turned over? The prior reports, Your Honor, yes. But I'm talking about the CCN as well, all three. I just want to be clear, you're saying P or YOR, and not prior reports. Prior reports, yes. But there's also the CCN report, which is the one that they're most interested in. I mean, none of it should have been suppressed. And, Your Honor, the government is not... What's the explanation on the CCN report? Is that the same one? I'm sorry, Your Honor. What is the explanation on why the CCN report wasn't turned over? Your Honor, the record doesn't indicate specifically why the CCN report was not turned over prior, only that it related to an incident that the DEA-6 was provided. And the DEA-6 provides extensive information about the arrest of the pill seeker and the fact that that arrest was based on the knowledge that the MRI that they presented was fraudulent. That information is contained within the DEA-6 for that report. I understand you've got the argument he had the DEA-6, but they've got a very, at least to me, important argument that the CCN report had independent value. And the government has no explanation. It was found later, right? After trial? Yes, Your Honor. How was it found then but not earlier? And again, Your Honor, I don't... The record doesn't indicate precisely how the CCN report was found, but the issue here... Can you understand why that's really troubling? At least to me, I can't speak for my colleagues, but that's deeply troubling to me that it's not found pretrial. You've had a DEA report, too, and we're aware of it. And then suddenly it appears after trial and nobody's given any explanation at all? Your Honor, when this issue occurred, the government argued and the court found that there was no ultimate grade violation, which is the issue on appeal, which requires that these reports be material in order to grant the remedy of a new trial, which means that this court must find that the suppression of this report... Yes, Your Honor. And so what is the government doing to prevent these errors from happening again? As Judge Santel pointed out, we've been warning the government for quite some time about the terrible consequences. And this is a case where the jury acquitted on one charge. So we have to do our job post-talk. But the whole point of Brady is the government's supposed to do this up front, not make a materiality analysis pretrial, and just turn these things over. Your Honor, I apologize if I gave you the impression that the reason they weren't turned over was because there was a pretrial materiality determination by the government. That was not the case. That's what we're worried about. That was not the case. That is part of what we've been saying, as I said, in the Stevens case, but backward, even when I was a district judge in another circuit, that you don't have to decide the materiality. That's something that can be seen by the defense and court. It's merely relevant. Why do you not turn it over? What's the downside to going ahead and complying with your obligation? Your Honor, what I'll note is that the district court here found that the government had performed a diligent search. This was not an issue of the government locating reports, determining they were not material, and not turning them over. I thought you just said that was with respect to one of the reports, that there was a pretrial materiality determination. Didn't you just say that? No, Your Honor. There was not a pretrial materiality determination with respect to either the CCM or the prior PRYOR reports. What I will also note, evidence that there was a diligent search by the government includes the fact that they did turn over multiple hundreds of pages from the St. Mary's County Police Department concerning the very investigation that the prior reports deal with. That may be enough to make this a harmless violation of Brady, a harmless error on your part, but I don't like the sense that the government is still trying to make Some states now have actually passed open file statutes requiring the state to quit attempting to withhold evidence based on their own materiality determination. Your Honor. We don't have that statute. I'm sorry we don't have it, but we don't have that statute. Why isn't that the way to proceed? If the government's got it and it's good evidence, what's the downside to letting the defense have it? Yes, Your Honor. But I'll note that even an open file discovery policy, were it instituted in this case, would not have discovered the prior reports. The prior reports were not saved within the same file for Dr. Robinson. They weren't saved. They were under a general file. This had been a report that was made in 2011. I think Judge McKell is asking about the CCM report. Yeah, what about the CCM? The record doesn't indicate why the CCM report was not located. The CCM report was a Metropolitan Police Department report concerning something that a federal DEA 6 had been turned over on, listing the majority of the Metropolitan Police Department officers that were involved in that case. Can you tell me how it was found after trial? I'm sorry, Your Honor.  No, Your Honor. The government, when it finds this thing after trial and turned it over to the defense, as it should have, didn't offer any explanation as to why it didn't find it beforehand? Your Honor, in the record as I have read it, there is a passing reference to the fact that there had been a DEA 6 that had been turned over and that, in addition, we were now providing a CCM. There's not an extensive discussion in the record of that. But if I may briefly make one argument on the materiality, Your Honor, this court, in order to grant a new trial, does have to find this material. And Robinson has argued that it was material because he was not in possession of government reports that showed that he was doing pill-seeking. This is why he claims this is different, in fact, from the evidence that he was able to introduce. The fact is, he was in possession of multiple government reports concerning both his discussion with St. Mary's County of prescription fraud investigations that were ongoing, which were the subject of the prior report, that it chose not to use, and it was in possession of a DEA 6 report, specifically on the 2013 pill seeker that was arrested, that it chose not to use. Perhaps because, in that same DEA 6 report, the description of the treatment of that patient accorded with every other patient's treatment, which was that she was not interviewed by Dr. Robinson. But they argue that the CCM report described more fully the nature of Dr. Robinson's practice, how his process of identifying the problem with the individual that was reported. And this reporting was happening at the same time that the government was saying, he doesn't turn over pill seekers, at the same time as the individuals that are the subject of the indictment. So it shows that at the very same time that he's being accused by the government of not turning over pill seekers, he was doing so, and because good faith medical practice is the whole issue here, he was doing it as part of a protocol in his practice. And so that's where it's both the timing and the nature of the description, which you don't have from DEA 6, that for me is the most difficult part of evaluating materiality in a case where the jury was very discerning and didn't convict on it. Two responses. The first, as you noted to my colleague, the government's argument was that he did not report any of the individuals in the indictment. Their closing argument was not based on the fact that he never reported pill seekers. Second, I would note that the materiality that is represented by Robinson is that the CCN report would corroborate from the government's source the testimony of the eyewitnesses from his practice that testified about his robust practices in reporting pill seekers. And the DEA 6 would do that, and yet they chose not to introduce it. It wouldn't do it, they say, with the amount of information focused on his practice. One focused on the person, this one focused on his practice. I mean, do you agree that the content of the two reports is different? I agree that it is different, Your Honor. And do you agree that the CCN report described, had a governmental description, a law enforcement description of how his practice identified the person that they were reporting, found the problem? It had a governmental recitation of what Robinson said regarding how he found the problem. But if I may point, Your Honor, to the DEA 6, this is at page 181 and 182 of the record, the DEA 6 specifically states that officers were informed by Robinson that he had a person there who was, quote, doctor shopping, and then paragraph seven, Reed was questioned about the MRI she presented to Robinson that made Robinson call the police and report her. It also notes that Reed stated West, which was her cohort, made and printed the MRI from her home. So there was information that the MRI was fraudulent, there was information that MRI was provided to Robinson, there was information that the reason Robinson called the police was because of the MRI, and there was a statement that Robinson reported her as a doctor shopper. Those all corroborate the eyewitness testimony of his employees, and this DEA 6, which was in the possession of the defense counsel, wasn't introduced at trial. They never attempted to. And so it undercuts their argument that CCN was so material as to change the outcome of a trial that it would lead to a reasonable probability when they had the ability to corroborate. If that was necessary, they had the ability to do it, and they didn't. And that simply undercuts their argument on material. One fact that's bothering me a little bit. You have a lot of good facts on the Gestalt, the standardized nature of the prescriptions, some of the entries in the records that look a little bit dubious. But one, I think, pretty powerful fact for the defense is this doctor secured a United States patent to treat patients with a particular mechanism. It's a device he invented. He's got the whole protocol. It includes use of painkillers. And that seems pretty different from just a normal pill pusher. And, I don't know, doesn't that make this a closer case and then put more pressure on materiality? I don't believe so, Your Honor. I think that it's important to note that the patent is not a medical approval of Dr. Robinson's. But it suggests a legitimacy and that there's substance to the practice. Well, a patent granted him exclusive rights in that process, but the patent itself doesn't speak to the medical legitimacy of that process. Well, maybe not objective medical legitimacy, but the question in this case, I'm sorry to jump in, is good faith. Good faith. And so he believed he had a system. The patent well documents that. Well, there is a patent document that's in the record, and it's in Volume 1. I don't know precisely the page. The oxycodone prescription part of the patent only calls for five days. And so it actually doesn't accord with the 60 pills of 30 milligrams of oxycodone that was being provided to these patients time and time again. And so I don't believe that simply having a patent, although it may lend an air of legitimacy, the jury heard about that. The jury heard all of these points, including that Dr. Robinson's practice had a bad patient style, including that Dr. Robinson had at times reported bad pill seekers. They took all of that evidence, weighed it, and said they still did not believe on 42 occasions that Dr. Robinson created a provider-patient relationship sufficient to prescribe oxycodone on those occasions. Can I just ask one question? And if you don't know, that's perfectly fine. But did the jury instruction in this case comport with Rouen from the Supreme Court's very strict? Yes, Your Honor. And this wasn't an issue that's been briefed. Yeah, no, that's fine. If you didn't know, I was going to say it's okay. I was just curious. I will just direct Your Honor to the jury instructions themselves. And they appear with respect to the distribution counts at page 5,112 of the transcript and continue to page 5,115. And there's also a standalone document of the jury instructions, which is at page 129. And the third element, as was presented to the jury, was, and I'm quoting here, defendant, in writing prescriptions, knowingly and intentionally distributed the drug outside of the usual course of medical practice, generally recognized and accepted in the United States, and not for a legitimate medical purpose. And so the jury instructions specifically tie the knowing and intentional mens rea to Dr. Robinson's practice of medicine and the legitimacy of the medical purposes. But we do believe that comports with Rouen. Thank you. And you said they haven't raised it. I just wanted to know. Unless the court has any further questions, we'd ask that you affirm it. Thank you. Mr. Metzlitz, we'll give you two minutes for rebuttal, please. Thank you, Your Honor. I just have a few brief points to make on rebuttal. I'd like to start with where you ended with the government, which is Rouen. We are not arguing an instructional error here. We're arguing centrally the Brady issue, is that there was important evidence that went to that central element, which everyone agrees was central, that was suppressed. And, in fact, in Rouen itself, Section 4 of the majority opinion, notes that the jury instructions told the jury they needed to find knowing and intentional conduct. And so the question here is, well, did the suppressed evidence undercut the jury's ability to fully and fairly weigh that? I want to make a few other points. I want to let you make your points, but can I ask a question? Of course. It's your time. Yours, too. So the government's argument is, all right, so the content of the DEA report and, in particular, CCN report differed. And you've argued about the value, in your view, but what is your argument that the delta between that content, so as the DEA report just said, you know, Bill Pusher reported by Dr. Robinson, how do we determine that that delta, which is not stark, it's there but not stark, that itself is material? So, Your Honor, I think that the delta is significant because the CCN report, I think, is clearer about how Robinson detected and then reported and took his prescription back in the presence of officers. To the extent the DEA report kind of contains- Wait, took his prescription back in the presence of officers? Yes. Or would he have given the prescription in the first place? Well, because at that point, he did not realize that she was a pill seeker. But as soon as he was aware, he stopped treating her and reported her, and he took his prescription back. I mean, you know, to the extent that I think the court is struggling with some of these materiality issues, I think it's exactly as Judge Sentelle said, all the way back to Stevens, which obviously my firm feels very strongly about. You know, the court's instinct here has been that when there is a difficult question, when something about the evidence needed to be weighed, the jury is the best party to weigh that in the first instance. And that goes to a point that I wanted to make respectfully, which is that, you know, there was a lot of discussion, obviously, of government diligence or how they located or failed to locate issues. You know, the law is quite clear that ultimately even an innocent Brady violation by the government remains a Brady violation. And it's also undisputed on the record that the defense asked for this multiple times before and throughout trial. And, you know, the key thing is that the jury never heard this evidence. I also want to move to the prior. I'll let you make the point, I promise. But I was just curious about this whole post-trial discovery thing. Anyhow, why was the defense seeking discovery and how did it happen that you're going to ask now, again, after trial for this information? So I agree with my friend on the other side. I think that the government's letter disclosing the prior report is at A189, and it describes kind of the repeated requests. I think there were eight requests. There was a post-trial hearing in, I think, February 2018. And the defense, again, kind of propounded its request because it knew these records had to exist. You know, it's simply unreasonable that there are no records of these reports. You know, we focus a lot on the CCN report. I do want to emphasize that, in our view, the prior reports are very significant. And this is another way, Your Honor, that it ties specifically into the indicted patients, is if you look at the prior reports, the prior reports are all about pill seekers from Southern Maryland, specifically pill seekers from Southern Maryland who were coming in and, you know, obtaining pills under false pretenses. And all the indictment patients were from Southern Maryland as well. So it creates, again, this kind of one-to-one match-up where the jury could really have strongly inferred that had Robinson been aware that the patients charged in the indictment were pill seekers, he very likely would have reported them. And, therefore, he very likely was not aware. I, you know, I want to close by emphasizing that the case law is extremely clear that Brady error is not a sufficiency of the evidence question. It's would the jury have, in essence, struggled with this evidence? Would it have weighed on their consideration? I think it clearly would have. I think it clearly would have weakened the government's case and, therefore, is material. You know, there's no harmless violation of Brady, really. You can't find a Brady violation but then hold it harmless. What you'd instead be doing is saying, well, there was no violation because the evidence was not material. And, respectfully, we think that for all the reasons we've raised in the briefs and we've discussed here today, we think the clear conclusion is that the suppressed evidence was material, and we respectfully request that the court vacate Dr. Robinson's convictions in court. Thank you very much. The case is submitted. Thank you.
judges: Millett, Katsas, Sentelle